DIAZ, Circuit Judge:
 

 Plaintiff Norfolk Southern Railway appeals the district court's order granting summary judgment for Defendant City of Roanoke, Virginia and Defendant-Intervenor Chesapeake Bay Foundation in this lawsuit alleging discriminatory taxation in violation of the Railroad Revitalization and Regulatory Reform Act of 1976. The district court concluded that the City's stormwater management charge is a fee, rather than a tax. This distinction matters because only taxes are subject to challenge under the Act. For the reasons that follow, we affirm.
 

 I.
 

 A.
 

 The City of Roanoke operates a stormwater management system that includes gutters, storm drains, channels, retention basins, and other infrastructure. The system collects stormwater and diverts it into the Roanoke River or one of its thirteen tributaries in the City.
 

 To operate its system, the City must hold a permit issued by Virginia's Department of Environmental Quality pursuant to the federal Clean Water Act and Environmental Protection Agency regulations. Such permits "require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions as the [EPA] or the State determines appropriate for the control of such pollutants."
 
 33 U.S.C. § 1342
 
 (p)(3)(B)(iii). The City's permit requires it to implement six "minimum control measures" and meet Total Maximum Daily Load ("TMDL") limits, among other requirements.
 
 [1]
 

 To facilitate compliance with applicable state and federal stormwater regulations, Virginia law authorizes municipalities to establish stormwater utilities and enact stormwater management charges.
 
 Va. Code Ann. § 15.2.2114
 
 . These charges must be enacted "by ordinance," and must "be based upon an analysis that demonstrates the rational relationship between the amount charged and the services provided."
 

 Id.
 

 § 15.2.2144(A), (B). Localities must also provide for full or partial waivers of charges to property owners who engage in certain stormwater management practices.
 

 Id.
 

 § 15.2-2114(D). Income from the charges "shall be dedicated special revenue ... and may be used only to pay or recover costs for" seven purposes related to stormwater management.
 

 Id.
 

 § 15.2-2114(A).
 

 In 2013, the Roanoke City Council enacted an ordinance establishing a Stormwater Management Utility and a stormwater
 utility charge. The City Council found that "an adequate, sustainable source of revenue for stormwater management activities is necessary to protect the general health, safety, and welfare of the residents of the city." Roanoke, Va., Code § 11.5-2. The Council also found that "parcels ... with higher amounts of impervious surfaces contribute greater amounts of stormwater and pollutants to the city's stormwater management system and that the owners of such parcels should carry a proportionate burden of the cost of such system."
 

 Id.
 

 Therefore, the Council chose to base the charge on "a parcel's impervious surface cover."
 

 Id.
 

 The ordinance imposes the stormwater management charge on all "improved parcels,"
 

 id.
 

 § 11.5-3(a), meaning all parcels with 250 square feet or more of impervious surface,
 

 id.
 

 § 11.5-10(e). An impervious surface is one that significantly impedes or prevents "the natural infiltration of water into the soil."
 

 Id.
 

 § 11.5-10(d). Approximately 86% of the parcels in the City are considered improved parcels subject to the charge. J.A. 57.
 

 Owners of improved parcels may apply for credits against the charge imposed upon them. Roanoke, Va., Code § 11.5-7. Credits are available for various stormwater management activities that reduce, control, or treat stormwater runoff from improved parcels, such as installing rain gardens or pervious asphalt.
 

 Id.
 

 ;
 
 see
 
 J.A. 135-36. The maximum credit allowed for a given parcel is 50% of the total charge.
 

 Id.
 

 § 11.5-7(b)(1).
 

 All revenue from the charge is deposited into a stormwater utility enterprise fund, which is separate from the City's general fund. The enterprise fund may only be used for six stormwater management-related purposes listed in
 
 Va. Code Ann. § 15.2-2114
 
 (A). Since it was established, the Utility has used all revenue from the charge for stormwater management.
 

 B.
 

 Norfolk Southern is one of the City's largest property owners, and it holds one of the City's largest improved parcels. In 2017, it was assessed a stormwater charge of $ 416,748.28 for that parcel. Much of Norfolk Southern's property is covered by railroad track and ballast. Ballast is the crushed stone surface beneath railroad tracks that stabilizes the tracks and drains stormwater away from them.
 

 Norfolk Southern claims that its ballasted property should be exempt from the charge. It contends that ballast is at least as pervious to stormwater runoff as lawns, which are not considered impervious surfaces and are not subject to the charge.
 

 C.
 

 Following unsuccessful attempts to exempt the ballasted property from the charge, Norfolk Southern sued the City, alleging that the stormwater management charge is a discriminatory tax in violation of the Railroad Revitalization and Regulatory Reform Act of 1976 (the "4-R Act"),
 
 49 U.S.C. § 11501
 
 . Under the 4-R Act, states and localities may not impose any "tax that discriminates against a rail carrier."
 

 Id.
 

 § 11501(b)(4). Norfolk Southern alleges that the City's stormwater management charge does just that because it treats ballasted property differently from lawns, even though the two are, in the railroad's view, equally pervious to stormwater.
 

 Following a period of discovery, the district court granted Defendants' motion for summary judgment, concluding that although it is "admittedly a close question," the charge is not subject to the 4-R Act's requirements because it is a fee rather
 than a tax.
 
 Norfolk S. Railway Co. v. City of Roanoke
 
 , No. 7:16 CV 00176,
 
 2017 WL 6599008
 
 , at *8-9 (W.D. Va. Dec. 26, 2017). We review the district court's decision de novo.
 
 Valero Terrestrial Corp. v. Caffrey
 
 ,
 
 205 F.3d 130
 
 , 133 (4th Cir. 2000).
 

 II.
 

 Because the 4-R Act applies only to taxes, not fees, we must determine whether the charge in this case is closer to (1) a paradigmatic tax, which "is imposed by a legislature upon many, or all, citizens" and "raises money, contributed to a general fund, and spent for the benefit of the entire community," or (2) a paradigmatic regulatory fee, which "is imposed by an agency upon those subject to its regulation," and serves regulatory purposes by disincentivizing conduct or raising money to defray regulatory expenses.
 
 San Juan Cellular Tel. Co. v. Pub. Serv. Comm'n
 
 ,
 
 967 F.2d 683
 
 , 685 (1st Cir. 1992). In answering this question, we are aided by the three-part framework suggested in
 
 San Juan Cellular
 
 and adopted by this court in
 
 Valero
 
 ,
 
 205 F.3d at 134
 
 .
 
 [2]
 
 This framework focuses on "(1) what entity imposes the charge; (2) what population is subject to the charge; and (3) what purposes are served by the use of the monies obtained by the charge."
 

 Id.
 

 If the charge falls "somewhere in the middle" between a classic tax and a classic fee, the most important of these considerations is the charge's purpose.
 

 Id.
 

 A.
 

 We first consider who sets the charge. A charge is more likely to be a tax if it's imposed by the legislature, rather than an administrative agency.
 
 Valero
 
 ,
 
 205 F.3d at 134
 
 . Here, this factor suggests that the charge is a tax because it's imposed by Roanoke's legislative body, the City Council.
 
 [3]
 

 B.
 

 Under the second
 
 San Juan Cellular
 
 factor, a charge is more likely to be a tax if it is imposed on a broad segment of the public.
 
 GenOn Mid-Atl., LLC v. Montgomery County
 
 ,
 
 650 F.3d 1021
 
 , 1024 (4th Cir. 2011). And assessment of a tax is often based "solely on ability to pay," as measured by a payor's property or income, rather than tied to the receipt of a particular benefit or the imposition of a regulatory burden.
 
 Nat'l Cable Television Ass'n, Inc v. United States
 
 ,
 
 415 U.S. 336
 
 , 341,
 
 94 S.Ct. 1146
 
 ,
 
 39 L.Ed.2d 370
 
 (1974) ;
 
 see
 

 DIRECTV, Inc. v. Tolson
 
 ,
 
 513 F.3d 119
 
 , 126 n.3 (4th Cir. 2008) (discussing the significance of whether an assessment is tied to
 income). By contrast, the classic fee is imposed only upon persons subject to regulation by a particular agency.
 
 Valero
 
 ,
 
 205 F.3d at 134
 
 .
 

 This factor suggested that the charge was a tax in
 
 Valero
 
 , where it was imposed upon persons disposing waste at landfills, who in turn passed the cost on to their customers, thereby spreading it "to a significantly wider portion of the population."
 

 Id.
 

 ; accord
 
 DIRECTV
 
 ,
 
 513 F.3d at 125-26
 
 . In
 
 GenOn
 
 , however, we concluded that a carbon emission charge was a fee rather than a tax primarily because the charge applied to only one entity.
 
 650 F.3d at 1024
 
 .
 
 [4]
 

 Here, the second factor is largely inconclusive. On the one hand, the stormwater management charge applies to a broad class of property owners, suggesting that it is a tax. But on the other hand, it isn't assessed
 
 solely
 
 on the basis of property ownership. Rather, the amount assessed is proportional to the amount of impervious surface on an owner's property. And property owners may receive credits against the assessment if they engage in certain stormwater management practices. These features suggest that the charge is a measure of the stormwater management obligations that each parcel imposes upon the City, rather than a measure of ability to pay. And this makes the charge more like a fee. These features also distinguish the stormwater management charge from the charge in
 
 Valero
 
 , which applied to all waste disposers regardless of their contribution to the burden that the charge was designed to address-closing underfunded landfills. On balance then, this second factor is effectively a wash as to the nature of the charge.
 

 C.
 

 Under the third
 
 San Juan Cellular
 
 factor-which is the most important one in close cases-a charge is more likely to be a tax if its primary purpose is to raise revenue for general government activity that benefits the entire community.
 
 967 F.2d at 685-86
 
 . This is true even if the revenue is placed into a special fund and segregated from general revenue, as long as "the special fund is used to benefit the population at large."
 
 Valero
 
 ,
 
 205 F.3d at 135
 
 . Conversely, a charge is more likely to be a fee if it's used to provide individualized benefits or to defray an agency's costs of regulating.
 
 San Juan Cellular
 
 ,
 
 967 F.2d at 685-86
 
 . A charge will also be considered a fee if its primary purpose is to regulate conduct by making it more expensive (even if the charge also raises revenue).
 
 S.C. ex rel. Tindal v. Block
 
 ,
 
 717 F.2d 874
 
 , 887 (4th Cir. 1983).
 

 The third factor pointed to the charge being a tax in
 
 Valero
 
 , where the funds collected were used to support the closure of underfunded landfills in an environmentally sound manner that complied with EPA regulations.
 
 205 F.3d at 134-35
 
 . The charge's purpose was to protect the state's groundwater, which benefitted the general public.
 

 Id.
 

 And in
 
 United States v. City of Huntington
 
 , the charge's purpose suggested it was a tax where the charge paid for "core government services" including fire and flood protection and street maintenance.
 
 999 F.2d 71
 
 , 73 (4th Cir. 1993).
 

 On the other hand, the charge's purpose suggested it was a fee in
 
 San Juan Cellular
 
 , where the funds were used to regulate cell phone providers.
 
 967 F.2d at 686
 
 . The court noted that there need not be an exact match between the charge assessed and the agency's expenditures on a particular regulated firm.
 

 Id.
 

 at 686-87
 
 . In
 
 GenOn
 
 , we found that a carbon emission charge was "plainly regulatory," just like a classic fee, because it "create[d] disincentives for GenOn to continue polluting and provide[d] funds for others to reduce their carbon dioxide emissions."
 
 650 F.3d at 1025
 
 .
 

 Courts have reached different results in applying the third factor to stormwater management charges. In
 
 DeKalb County
 
 , the court concluded that the third factor suggested the charge was a tax because the benefits of stormwater management-flood prevention and abatement of water pollution-were shared broadly by the general public. 108 Fed.Cl. at 701. The court also noted that the assessment of a stormwater charge is based "not on the
 
 benefits
 
 derived by the payor, but by the anticipated
 
 burden
 
 that its property imposes on the stormwater system."
 
 Id.
 
 at 703. And the charge couldn't be considered a voluntary user fee because property owners couldn't decline stormwater services.
 
 Id.
 
 at 704-06. The
 
 McLeod
 
 court reached a similar result, noting that "[s]torm water management was and is the type of service that is often funded through general tax revenue." 254 F.Supp.2d at 1347-48. The
 
 Homewood Village
 
 court, however, reached the opposite conclusion, noting that although all residents receive a benefit from stormwater management, "those paying the charge receive a special benefit" because the county treats polluted water on their properties, facilitating compliance with state and federal requirements. 132 F.Supp.3d at 1381 (citing
 
 Homewood Vill., LLC v. Unified Gov't of Athens-Clarke County
 
 ,
 
 292 Ga. 514
 
 ,
 
 739 S.E.2d 316
 
 , 318 (2013) ).
 

 Norfolk Southern argues that Roanoke's stormwater management charge serves two purposes that both benefit the general public: reducing water pollution and improving flood control. It analogizes these purposes to maintaining the safety of the state's groundwater, which we held to be a public benefit in
 
 Valero
 
 . Defendants respond that they are obligated by law to operate a stormwater management system and to use all revenue generated from the charge for specific stormwater management activities. Thus, although the charge may benefit the public, its primary purpose is to satisfy regulatory requirements.
 
 [5]
 
 Norfolk Southern's rejoinder is that the charge isn't regulatory in the sense recognized by
 
 San Juan Cellular
 
 because the City is a regulated entity, rather than a regulator. The railroad notes that the stormwater Utility doesn't directly regulate its activity or issue any permit for its stormwater discharges.
 

 We think the charge's purpose is more consistent with that of a fee than a tax, because the charge forms part of a comprehensive regulatory scheme. Although municipalities may have traditionally provided stormwater management as a public benefit at the discretion of their legislatures, the Clean Water Act's regulatory scheme now requires the City to take myriad concrete actions to reduce discharges and pollutant concentrations-many of them relating directly to runoff from Norfolk Southern's property and the waters
 that receive it.
 
 See, e.g.
 
 , J.A. 140-44, 169-80, 262, 284-86, 554-58.
 

 What's more, if the City elects to assess a charge to offset the costs of complying with these regulatory obligations, it must do so consistent with the state authorizing statute,
 
 Va. Code Ann. § 15.2-2114
 
 . This statute restricts the funds to specific uses related to stormwater management, and it requires that the charge incentivize stormwater management practices by crediting property owners who adopt them.
 

 Id.
 

 § 15.2-2114(D). These requirements have removed much of the legislative discretion that was traditionally associated with stormwater management. The City is now a participant in a comprehensive scheme regulating stormwater management and the assessment of charges to pay for it.
 

 Of course, the City doesn't directly regulate Norfolk Southern or other stormwater dischargers, nor does it issue permits for their discharges. Thus, rather than defraying the City's costs of regulating, the charge primarily defrays the City's costs of complying with regulations imposed upon it. At bottom, however, a classic regulatory fee is designed to address harmful impacts of otherwise permissible activities, and to ensure that the actors responsible for those impacts bear the costs of addressing them. That is exactly the function served by Roanoke's stormwater management charge, which ensures that owners of impervious surfaces bear the cost of managing stormwater runoff.
 

 In sum, the charge is part of a regulatory scheme, rooted in the Clean Water Act, whose purpose is to remedy the environmental harms associated with stormwater runoff and to hold stormwater dischargers responsible for footing the bill. EPA's regulations ensure that the harms of stormwater discharge are addressed, and the City levies a charge (as directed by the state) upon those whose activity creates the need for regulation. The charge also serves the regulatory function of incentivizing property owners to reduce the amount of impervious surface on their land and engage in stormwater management practices that qualify them for credits.
 

 As a result, the third
 
 San Juan Cellular
 
 factor suggests that the charge is a fee.
 

 D.
 

 Finally, we consider the three
 
 San Juan Cellular
 
 factors collectively, in light of all the relevant circumstances, to decide whether the City's stormwater management charge is a tax subject to the 4-R Act's requirements, or a fee beyond the reach of those requirements. As the district court acknowledged, this is a "close question."
 
 Norfolk S.
 
 ,
 
 2017 WL 6599008
 
 , at *8. The first factor suggests that the charge is a tax because it's imposed by the legislature. The second factor is largely inconclusive because the charge is levied upon most properties but based on contributions to stormwater runoff rather than ability to pay. The third factor suggests that the charge is a fee because it forms part of a comprehensive regulatory scheme.
 

 Applying the principle we articulated in
 
 Valero
 
 ,
 
 205 F.3d at 134
 
 , we give the third factor controlling weight here because the charge's regulatory purpose provides a better indication of its overall nature than the body that implemented it or the class of persons it is levied upon.
 
 See also
 

 Club Ass'n of W. Va., Inc. v. Wise
 
 ,
 
 293 F.3d 723
 
 , 726 (4th Cir. 2002) (applying this principle). Accordingly, we conclude that the charge is a fee, rather than a tax subject to the 4-R Act's requirements. The district court correctly granted Defendants' motion for summary judgment.
 

 AFFIRMED
 

 Minimum control measures include various means of reducing pollutants to comply with the Clean Water Act, from public outreach and participation to system operation and maintenance. EPA, National Pollutant Discharge Elimination System-Regulations for Revision of the Water Pollution Control Program Addressing Storm Water Discharges,
 
 64 Fed. Reg. 68,722
 
 , 68,752 (Dec. 8, 1999). TMDLs limit total discharges of specified pollutants based on water quality criteria.
 
 33 U.S.C. § 1313
 
 (d).
 

 Defendants urge us not to apply the
 
 San Juan Cellular
 
 framework to this 4-R Act case because it was developed in cases that concerned different statutes. Nothing about the framework, however, is statute-specific. As Judge Wynn aptly notes in his concurring opinion, it merely provides flexible and versatile guidance in assessing where a particular charge sits on the tax-fee continuum. Indeed,
 
 San Juan Cellular
 
 aimed to synthesize the general approach that courts had taken to distinguish taxes from fees "in a variety of statutory contexts."
 
 967 F.2d at 685
 
 .
 

 As Defendants point out, the Virginia statute authorizing the charge requires that it be passed through ordinance by the City Council. This makes the Council somewhat less like an autonomous legislature and somewhat more like an administrative agency implementing the state statute, which itself forms a part of the Clean Water Act's comprehensive regulatory scheme. But the authorizing statute still requires
 
 legislative
 
 decision-making through passage of an ordinance. The Council's decision acts as a check on the regulatory program, in much the same way that legislatures' appropriations decisions can check agencies' regulatory programs. Thus, we consider the Council to have acted in a predominantly legislative capacity for purposes of the first factor.
 

 Courts have differed as to how the second factor applies to stormwater management charges.
 
 Compare
 

 DeKalb County v. United States
 
 ,
 
 108 Fed.Cl. 681
 
 , 700-01 (2013) (concluding that the second factor suggested a stormwater management charge was a tax),
 
 and McLeod v. Columbia County
 
 ,
 
 254 F.Supp.2d 1340
 
 , 1346 (S.D. Ga. 2003) (same),
 
 with
 

 Homewood Vill., LLC v. Unified Gov't of Athens-Clarke County
 
 ,
 
 132 F.Supp.3d 1376
 
 , 1381 (M.D. Ga. 2015) (reaching the opposite conclusion).
 

 Defendants also note that all revenue from the charge is placed into a segregated enterprise fund, rather than the City's general fund. But standing alone, the fact that revenue from the charge is placed in a special fund is "immaterial."
 
 Valero
 
 ,
 
 205 F.3d at 135
 
 .